**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | Case No. 19-cr-79-CJW |
| Plaintiff, | | |
| vs. | | **REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS TO SUPPRESS** |
| ADAM SCOTT LEIVA and CHRISTIN CAMPBELL-MARTIN, | | |
| Defendants. | | |

_____

**TABLE OF CONTENTS**

I.      INTRODUCTION................................................................................3

II.     FINDING OF FACTS........................................................................3

III.    THE PARTIES' POSITIONS ...........................................................7

IV.     ANALYSIS .......................................................................................8

      A.     *Officer Hotz lawfully seized Defendants based on reasonable suspicion they were involved in criminal activity*........................................8

      B.     *Whether Defendants have standing to challenge the search of the SUV and the backpack* ...................................................... 17

             i.     *Defendant Campbell-Martin does not have standing to challenge the search of the SUV or the backpack* ............................. 19

             ii.     *Defendant Leiva does not have standing to challenge the search of the SUV*................................................................. 21

             iii.    *Defendant Leiva has standing to challenge the search of the backpack* ................................................................. 22

1

C.     *The Government's inevitable discovery doctrine argument is inapplicable.* ................................................................. **26**

D.     *Whether the warrantless search of the SUV and its contents was unconstitutional.* ................................................... **28**

    i.    *Inventory exception* .................................................... **29**

        a.    *The police properly impounded the vehicle in accordance with the Marion Police Department's vehicle impound and inventory policies.* ............................................... **33**

        b.    *The police followed standardized procedures in impounding and conducting an inventory search of the SUV until Sergeant Holland found the bag of suspected methamphetamine.* ............................................... **36**

        c.    *The police did not act in bad faith or for the sole purpose of investigation in conducting the inventory search.* ...... **37**

    ii.    *Search incident to arrest exception* ................................. **38**

V.    *CONCLUSION* ................................................................. **39**

# I.   INTRODUCTION

Before me is a Motion to Suppress filed by Defendant Adam Leiva ("Leiva") (Doc. 34) and a Motion to Suppress Evidence filed by Defendant Christin Campbell-Martin ("Campbell-Martin").  (Doc. 36.)  The Government filed a timely resistance.  (Doc. 42.)  I held a hearing on both motions on November 19, 2019.  The Government called two witnesses, Officer Nicole Hotz and Sergeant Richard Holland from the Marion Police Department.  Among the exhibits admitted into evidence are their reports and the audio and video recorded from their body cameras.  The Defendants called no witnesses.  Each party filed a timely post-hearing brief.  (Docs. 48, 49, and 53.)  The matter is now fully submitted.

On July 23, 2019, the grand jury returned an indictment charging both Defendants with one count of Possession with the Intent to Distribute a Controlled Substance Near a Protected Location and Aiding and Abetting the Possession with Intent to Distribute in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(A), 860(a), and 18 U.S.C. Section 2.  (Doc.  3.)  More specifically, the indictment charges them with this crime involving 50 grams methamphetamine near Linn-Mar High School.  *Id.*

# II.   FINDING OF FACTS

These incidents occurred on May 25, 2018 at approximately 10:30 p.m. in the north parking lot of Linn-Mar High School in Marion, Iowa.  City of Marion Police Officer Nicole Hotz was patrolling the parking lot at the request of the school's administrators.  (Hotz Hr'g Test.)  She had been actively engaged in requesting people leave the parking lot when she saw a red SUV occupied by three passengers, two of whom were ultimately identified as Leiva and Campbell-Martin.  The backseat passenger was Justin Harris.  Harris provided Officer Hotz an Iowa identification card to prove his identification.  (*Id.*)  Campbell-Martin initially identified herself as Shannon McKelvy.

3

(Doc. 37 at 1.)  Leiva initially identified himself as Favian Estrada.  (*Id.*)  The driver was ultimately identified as Campbell-Martin and the front seat passenger as Leiva.  (*Id.*)

When Officer Hotz pulled up beside the SUV she saw Campbell-Martin raise her hands near her face in a manner Officer Hotz characterized as attempting to hide her identity.  (Hotz Hr'g Test.)  Officer Hotz first shined a spotlight on the SUV before exiting her squad car and approaching on foot.  (Doc. 37 at 1.)  Officer Hotz's report describes Campbell-Martin's appearance and behavior when initially confronted:

> The female rolled down the window and I observed that she was very nervous and fidgety.  Her speech was quick, and her pupils were constricted which was out of the normal for the darker lighting conditions.  She kept pulling her knees to her chest and breathing really heavy.

(Doc. 37 at 1.)  Officer Hotz's report also described the male passengers' behavior as "very quiet and [they] did not look towards me." (Doc. 37 at 1.)  Officer Hotz requested identification from the occupants of the SUV.  (*Id.*)  Harris produced genuine identification, but each Defendant provided a name that turned out to be false.  (Doc. 37 at 1.)  Neither Defendant was able to supply the last four digits of his or her social security number or any form of identification.  (*Id.*)  Officer Hotz inquired about the car's owner.  (Ex. B at 8:20.)  Campbell-Martin indicated Harris was the owner, but Harris denied this, indicating it had been borrowed from one April Johnson.  (*Id.*)  Harris denied having a phone number to reach April.  (*Id.* at 10:10.)  Campbell-Martin told Officer Hotz she left her house without her "items."  (Doc. 37 at 1.)  Officer Hotz requested permission to search the vehicle, but Harris denied permission.  (Ex. B at 9:40.)

Sergeant Richard Holland from the Marion police department subsequently arrived on the scene.  (*Id.* at 13:00.)  Sergeant Holland questioned the occupants of the SUV while Officer Hotz ran the information Defendant provided through a law enforcement database.  (Ex. C at 3:00.)  During this questioning, Sergeant Holland noticed a purse in

the back seat of the vehicle that Campbell-Martin reported belonged to the registered owner. (*Id.* at 3:40.) Sergeant Holland asked if he could search the purse, but Campbell-Martin explained she was unable to grant permission because the purse did not belong to her. (*Id.*)

Officer Hotz returned to the SUV after she determined the information Leiva provided was false. (Ex. B at 15:00.) Officer Hotz went to the passenger side of the vehicle and asked Leiva to get out. (*Id.* at 15:20.) At this point she noticed a black backpack on the front floor of the vehicle. (Doc. 37 at 1.) Officer Hotz removed Leiva from the vehicle and arrested him for providing false information. (Ex. B at 15:30.) Leiva then provided his real name while Officer Hotz searched him during the arrest. (*Id.*) Leiva stated he had provided false information because of pending warrants. (*Id.* at 16:35.)

Sergeant Holland briefly left the immediate scene but remained in the parking lot, encouraging other drivers to leave. (Ex. C at 10:50.) When he returned, Harris told him the registered owner had loaned them and they were "in charge of the car." (*Id.* at 15:25.) Sergeant Holland asked Harris to look through the purse, and Harris complied. (*Id.* at 16:00.) Harris produced an ID for Campbell-Martin that Officer Hotz matched to the driver of the vehicle. (*Id.* at 16:45.) Officer Hotz then arrested Campbell-Martin for providing false information. (*Id.* at 17:55.)

Officer Hotz contacted a towing service for the vehicle and Sergeant Holland began what the Government contends is an inventory[1] of the vehicle incident to towing. (*Id.* at 19:30.) Prior to the inventory Harris asked whether he could drive the car, but Sergeant Holland denied permission. (*Id.* at 18:40.) During the inventory, Sergeant Holland located what appeared to be methamphetamine inside the backpack located near

---

[1] A principal issue to address is whether this was a lawful inventory or an unlawful search. I refer to it as an inventory at this juncture merely for ease of reference.

where Leiva had been sitting. (*Id.* at 22:00.) This substance was later weighed and determined to be 929.5 grams of methamphetamine. (*Id.*) After finding this substance, Sergeant Holland instructed Officer Hotz to take Leiva out of the squad car and Mirandize him. (*Id.* at 27:10.) After Officer Hotz Mirandized Leiva, Sergeant Holland explained what he discovered in the backpack near Leiva's seat. (*Id.*) Leiva denied knowledge of the backpack's contents. (*Id.* at 31:35.)

Officer Hotz returned to the squad car to retrieve Campbell-Martin and Mirandize her. (Ex. B. at 45:00.) Officer Hotz questioned Campbell-Martin after she Mirandized her. (*Id.* at 46:00.) Campbell-Martin stated Leiva and Harris picked her up in Ames, Iowa because her boyfriend was abusing her. (*Id.* at 46:20.) She denied using methamphetamine and denied knowledge of the backpack containing what law enforcement believed to be methamphetamine. (*Id.* at 47:50.) She stated that Leiva first drove the vehicle and Campbell-Martin started driving after Leiva became lost. (*Id.* at 48:20.) She further stated their destination was the Microtel in Marion because she was very tired. (*Id.* at 48:20.) She also admitted she had knowledge that Leiva deals methamphetamine and that the bag belonged to him. (*Id.* at 50:00.) She stated that earlier in the day they had traveled to Altoona, Iowa where he obtained a large amount of methamphetamine. (*Id.* at 51:15.)

After Officer Hotz Mirandized both Defendants, she and Sergeant Holland conducted post-*Miranda* interviews. Sergeant Holland returned to the SUV and continued the inventory search. (Ex. C at 32:00.) Sergeant Holland found additional items in the SUV, including small baggies approximately one inch by one inch, an electronic scale, paperwork with names and dollar amounts, including both Defendants' names, a glass pipe, and cash. (*Id.* at 35:45; Doc. 37 at 5.) Sergeant Holland instructed Officer Hotz to take pictures of the SUV and transport the occupants to the police station. (Ex. C at 40:30.)

### III. THE PARTIES' POSITIONS

Campbell-Martin asks the Court to suppress all evidence obtained from the traffic stop because she contends officers conducted the stop without a warrant, probable cause, or reasonable suspicion. Because there was no exception to the warrant requirement and because she had a reasonable expectation of privacy in the area searched, she contends the evidence should be suppressed. Finally, she contends the automobile search, search incident to arrest, and inventory exceptions to the warrant requirement are not applicable. Therefore, she contends the fruits of the search, including both Defendants' cellular telephones, all contraband seized, and statements made immediately after the methamphetamine was discovered by both Defendants should be suppressed.

Leiva asks the Court to suppress all evidence obtained from the traffic stop because he contends Officer Hotz conducted the stop without a warrant or reasonable suspicion. He argues Officer Hotz illegally seized him when he acquiesced to her demand to provide identification. He also contends that neither the exigent circumstances, search incident to arrest, automobile, nor inventory exceptions to the warrant requirement are applicable to the warrantless search of the SUV and backpack. He therefore contends the searches violated his Fourth Amendment rights and the Court should suppress all evidence obtained in those searches. (*Id.*)

The Government contends Officer Hotz's initial encounter with Defendants was consensual and not an unlawful seizure. The Government further contends that during the encounter Officer Hotz developed reasonable suspicion of criminal activity and the subsequent warrantless search was lawful. The Government challenges the standing of Defendants to object search of the SUV and backpack. The Government asserts the inevitable discovery doctrine permits the evidence to be admitted. Finally, the Government argues the search incident to arrest and inventory exceptions to the warrant requirement are applicable.

7

# IV. ANALYSIS

**A.      Officer Hotz lawfully seized Defendants based on reasonable suspicion they were involved in criminal activity.**

Not all encounters between law enforcement and citizens implicate the Fourth Amendment. "The Fourth Amendment protects individuals against unreasonable searches and seizures by the government." *United States v. Williams*, 521 F.3d 902, 905 (8th Cir. 2008) (citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). "The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security[.]" *Maryland v. Wilson*, 519 U.S. 408, 411 (1997) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977)). A person is seized within the meaning of the Fourth Amendment "when the officer, by means of physical force or show of authority, terminates or restrains [the person']s freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations omitted). Under this standard, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). *See also Michigan v. Chesternut*, 486 U.S. 567, 574 (1988) (holding that the test for whether a person has been "seized" within the meaning of the Fourth Amendment is an "objective standard" that looks to whether a reasonable person would have believed that he was not free to leave); *INS v. Delgado*, 466 U.S. 210, 215 (1984) (holding that a seizure occurs "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").

A "consensual" encounter between law enforcement and a citizen is not subject to Fourth Amendment scrutiny. *See Bostick*, 501 U.S. at 434. "So long as a reasonable

8

person would feel free to disregard the police and go about his business, the encounter is consensual, and no reasonable suspicion is required." *Bostick*, 501 U.S. at 434 (internal quotation omitted). "The determination whether an encounter is consensual depends upon the unique factual nature of each case," and thus requires consideration of "all the circumstances." *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007). *See also United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012) (in determining whether an encounter between an officer and a person is consensual, courts consider the totality of the circumstances).

A seizure clearly occurred. The first issue before the Court is when the seizure occurred. Defendants argue Officer Hotz seized the SUV and thus its occupants when she approached the vehicle. (Doc. 34-1 at 3-7); (Doc. 36-1 at 6-8.) Defendants argue that Officer Hotz unconstitutionally seized them because the seizure was not supported by probable cause or reasonable suspicion. (Doc. 34-1 at 3-7); (Doc. 36-1 at 6-8.)

The Government responds that Officer Hotz's initial contact with Defendants was a consensual encounter, not a seizure. (Doc. 42-1 at 7-12.) The Government argues that Officer Hotz developed reasonable suspicion to seize Defendants following her initial consensual encounter with the Defendants. (*Id.* at 12-14.)

I find that neither Defendant was seized during Officer Hotz's initial encounter with them when she first approached the SUV. Rather, neither Defendant was seized until placed in handcuffs. Officer Hotz placed Leiva in handcuffs after she determined he had provided false information. (Ex. B. at 15:39) Officer also placed Campbell-Martin in handcuffs after she provided false information. (*Id.* at 33:17).

"Not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry*, 392 U.S. at 19 n.16. A "seizure" occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Id.* When determining "whether a particular encounter constitutes a

seizure, a court must consider all the circumstances surrounding the encounter." *United States v. Mabery*, 686 F.3d 591, 596 (8th Cir. 2012). The Eighth Circuit has identified seven non-exclusive factors to consider in this analysis:

> Some circumstances which inform our decision-making include: officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

*United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) (internal citations omitted). The Court must decide if, given all the circumstances, "the police conduct . . . communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Mabery*, 686 F.3d at 596. If police conduct communicated such a message, the encounter constitutes a seizure.

Defendants characterize their initial encounter with Officer Hotz as a "traffic stop" (Doc. 34-1 at 8 Doc. 53 at 7). While the encounter involved vehicles, there was not a "traffic stop" in the usual sense. Officer Hotz did not exercise her authority as a law enforcement officer to make the SUV stop. Defendants had already parked the SUV before Officer Hotz drove up and then approached the vehicle on foot. (Doc. 37 at 1.) This is an important distinction. While a traffic stop constitutes a seizure, a law enforcement officer merely approaching a parked vehicle does not necessarily constitute a seizure unless the encounter satisfies the test described above. For example, in *Rodriguez v. United States*, the Supreme Court characterized a "routine traffic stop" as "[a] seizure for a traffic violation." 575 U.S. 348, 354 (2015). In contrast, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place." *Bostick*, 501 U.S. at 434 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion). In *United States v.*

*Barry*, the Eighth Circuit applied this distinction in finding that a law enforcement officer approaching the defendant's parked car, knocking on the window three times, and shining his flashlight into the vehicle did not constitute a seizure. 394 F.3d 1070, 1075 (8th Cir. 2005). Given this distinction, Officer Hotz did not stop Defendants and thus did not "seize" Defendants when she initially approached the vehicle unless her actions restrained Defendants' liberty. *Terry* 392 U.S. at 19 n.16.

The case at bar closely resembles *Barry* and *United States v. Vera* 457 F.3d 831 (8th Cir. 2006). In *Barry*, a law enforcement officer noticed a parked vehicle's headlights in an alley behind a shopping mall shortly after 11 p.m. 394 F.3d at 1072. The law officer believed most of the businesses were closed, and found the parked car suspicious. *Id.* The area had also recently experienced crime. *Id.* The officer did not turn on his emergency lights but kept his headlights on as he approached. *Id.* As he approached the vehicle, he shined his flashlight, was in full uniform, and kept his hand on his firearm. *Id.* He knocked twice on the passenger-side window, but the occupants ignored him. *Id.* The occupants rolled down the passenger-side window after the officer knocked on the window a third time. *Id.* As the occupants did so, the officer smelled what he believed was a mixture of marijuana and air freshener. *Id.* He believed the odor provided grounds to detain the occupants, so he called for backup and asked the occupants to step out of the vehicle. *Id.* at 1072-73.

The Eighth Circuit found the officer did not violate the defendant's Fourth Amendment rights because the defendant "was not seized until [the officer] asked [the defendant] to exit the vehicle. *Id.* at 1075. "[The officer's] conduct in approaching [the defendant's] parked vehicle and knocking on the window did not amount to a show of authority such that a reasonable person would believe he was not at liberty to ignore [the officer's] presence and go about his business." *Id.* Because the officer did not seize the

defendant until the officer asked him to exit his vehicle, the encounter up to that point "did not implicate the Fourth Amendment." *Id.* at 1077.

*Vera* subsequently clarified that "a constitutionally significant distinction" exists "between an official command and a request" and found an officer asking a passenger to exit a vehicle does not necessarily constitute a seizure. *Vera*, 457 F.3d at 835-36. To constitute a seizure, the officer must command, rather than request, that the passenger exit the vehicle. "Absent a factual finding that [the officer] did more than request [the defendant] to exit his vehicle, provide his identification, and enter the patrol car, there is no basis to conclude that the encounter was anything other than consensual." *Id.* at 836. The officer is also not required to inform the individual if the officer's language constitutes a request or command, as "[t]here is no per se requirement that an officer inform a citizen of his right to refuse consent, and there is no presumption that consent is invalid where given without an explicit notification of the right to refuse." *Id.* at 835. The Eighth Circuit also found that "because the fact that 'most law enforcement officers are armed is well known to the public,' a holstered firearm is 'unlikely to contribute to the coerciveness' of an encounter with police." *Vera*, 457 F.3d at 836 (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)).

In the case at bar, the SUV was parked in a school parking lot prior to Officer Hotz approaching it. (Doc. 37 at 1; Hotz Hr'g Test.) Much as the officer in *Barry* who was present near a shopping mall that had recently experienced crime, Officer Hotz was present because school administrators suspected teenagers had recently damaged the parking lots. (Hotz Hr'g Test.) Also like the officer in *Barry*, Officer Hotz approached the parked vehicle and unsuccessfully tried to attract the occupants' attention. (*Id.*) Officer Hotz shined her spotlight into the vehicle but the occupants did not respond. (*Id.*) Officer Hotz then approached the SUV. (*Id.*) She was wearing her full uniform, but neither brandished her gun nor turned on her vehicle's emergency lights. (*Id.*)

12

Officer Hotz did not ask any of the occupants to exit the vehicle when she initially approached it. Instead, Officer Hotz asked for identifying information. Such questions do not violate the occupants' Fourth Amendment rights. *See Barry*, 394 F.3d at 1074 (finding that an officer may ask someone "if he is willing to answer some questions," and may "put[] questions to him if the person is willing to listen" without violating his Fourth Amendment rights). I note nothing about Officer Hotz's behavior towards either Defendant that would constitute a seizure until she handcuffed them and exercised "physical force" over them. *Mabery*, 686 F.3d at 596.

Campbell-Martin argues that by using the light and approaching the car on foot as a uniformed officer equipped with a badge and gun, Officer Hotz seized the occupants immediately because a reasonable person would not have felt free to drive away. (Doc. 36-1.) I respectfully disagree. There is no evidence that Officer Hotz directed the occupants to remain in the car or remain in the lot. She testified they were free to drive away. Her assignment, in fact, was to encourage drivers to do just that. Her testimony, Sergeant Holland's testimony, and the video footage confirm law enforcement efforts to make drivers leave the parking lot before and during the interaction with the occupants of the SUV. This in turn confirms Officer Hotz's explanation of her interaction with the SUV's occupants. There is no reason to doubt her initial plan was to gain their attention and get them to leave. She did not, for example, block them in with her vehicle or turn on her emergency lights. Her assignment and her behavior toward the SUV's occupants are consistent with her initial intentions of encouraging unwanted visitors to leave. Her subsequent actions are consistent with her increasing suspicion as the consensual encounter continued. Campbell-Martin admits that Officer Hotz eventually developed probable cause or reasonable suspicion to believe criminal activity was afoot; i.e., that Campbell-Martin was driving without a license. (Doc. 36-1 at 7.) I agree with the conclusion that Officer Hotz developed reasonable suspicion and then probable cause. I

13

simply disagree that Officer Hotz seized either Defendant prior to the advent of reasonable suspicion.

Officers may only conduct investigatory stops if they have reasonable suspicion that "criminal activity may be afoot." *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015). Reasonable suspicion is based on the totality of the circumstances and requires a "particularized and objective basis" for suspecting legal wrongdoing before a stop can be justified. *Patrick*, 776 F.3d at 954 (quoting *United States v. Cortez,* 449 U.S. 411, 417 (1981)). A hunch does not constitute reasonable suspicion to justify a stop. *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018) (citing *Terry*, 392 U.S. at 27). Rather, officers must be able to articulate "some minimal, objective justification for an investigatory stop." *United States v. Walker*, 555 F.3d 716, 719 (8th Cir. 2009) (quoting *United States v. Fuse,* 391 F.3d 924, 929 (8th Cir.2004)).

Whether a stop is a *Terry* stop or a traffic stop, the constitutionally acceptable length of the seizure of the individuals involved is determined by the seizure's "mission." *See Rodriguez*, 575 U.S. at 354 (citing *Illinois v. Caballes,* 543 U.S. 405, 407 (2005)). Stops may last no longer than necessary to allow officers to achieve their stated purpose. *Id.* (citations omitted) (discussing traffic stops); *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010) (discussing *Terry* stops); *United States v. Jones*, 269 F.3d 919, 929 (8th Cir. 2001) (discussing traffic stops); *United States v. Johnson*, No. CR05-4063-MWB, 2005 WL 2704892, at *10 (N.D. Iowa Oct. 20, 2005) (citing *United States v. Leshuk,* 65 F.3d 1105, 1109 (4th Cir.1995)) (discussing *Terry* stops). Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at "the totality of the circumstances, in light of the officer's experience." *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997) (citations and quotation marks omitted).

Here, Officer Hotz initially sought the occupants' attention to persuade them to leave. After she could not get their attention – which in itself was suspicious – suspicion mounted quickly. From the beginning of the encounter, as shown on Officer Hotz's body camera video, Campbell-Martin appears extremely nervous. Exhibit B. By the time Officer Hotz's audio begins recording, Campbell-Martin had evidently explained something about their inability to obtain a hotel room. Officer Hotz explained the reason she was patrolling the parking lot and asked for identification. Given that she was driving the vehicle, Campbell-Martin's response that she did not have identification was suspicious, as was the tone of her response which was somewhat frantic. Officer Hotz verbalized her evident suspicion at this point stating, "Something's going on right now." By this point, Officer Hotz had reasonable suspicion to expand the scope of the stop to investigate, at the very least, whether Campbell-Martin was operating the vehicle without a license in her possession.[2] Campbell-Martin's behavior also appears to have aroused suspicion that she was under the influence. Officer Hotz testified she believed Campbell-Martin was "tweaking" (i.e., under the influence of drugs) and she can be heard saying as much on the audio recorded on her body camera.

Officer Hotz was thus entitled to request identification from the occupants of the car without turning the encounter into a seizure, and she chose to do so. *See United States v. Stewart*, 631 F.3d 453, 456 (8th Cir. 2011). At this juncture, Officer Hotz was alone and had not taken any action that could reasonably constitute a show of force. Officer Hotz's subsequent actions of questioning the occupants of the vehicle and requesting their identification were consistent with her investigation based on her

---

[2] Iowa Code § 321.174 ("A licensee shall have the licensee's driver's license in immediate possession at all times when operating a motor vehicle and shall display the same upon demand of a judicial magistrate, district associate judge, district judge, peace officer, or examiner of the department.")

reasonable suspicion and did not constitute a seizure. Ultimately the Defendants were seized when they were ordered out of the car to be handcuffed.

When Officer Hotz ordered the Defendants out of the car to handcuff them, thus seizing them, she had reasonable suspicion that a crime was being committed. The Eighth Circuit found reasonable suspicion existed "consider[ing] the combination of [the defendant's] nervous condition, his difficulty in answering basic questions about his itinerary, and his failure to be forthright about his criminal history relating to drugs." *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012). In the case at bar, Officer Hotz noted Campbell-Martin's nervous demeanor, leading her to suspect Campbell-Martin was "tweaking." (Ex. B at 13:00.) Campbell-Martin was also unable to provide Officer Hotz with identification information and could not provide the last four digits of her social security number. (*Id.* at 4:00.) Lastly, Officer Hotz received a message alerting her that Campbell-Martin was wanted, armed, and dangerous. (*Id.* at 33:00.) These facts created a reasonable suspicion that Campbell-Martin was involved in a crime. Officer Hotz handcuffed Campbell-Martin immediately after receiving this message. (*Id.* at 33:17.)

Officer Hotz also had reasonable suspicion to seize Leiva. Like Campbell-Martin, Leiva was unable to provide verification of his identity and was unable to tell Officer Hotz the last four digits of his social security number. (*Id.* at 4:00; 12:15.) Officer Hotz testified that in her experience most people are able to provide the last four digits of their social security number. (Hotz Hr'g Test.) Her suspicion was also raised when Leiva appeared to "stumble" in providing his birthdate. (Ex. B at 4:00.) Lastly, Officer Hotz noticed the picture in her database associated with Favian Estrada did not match Leiva. (Doc. 37 at 1.) According to Officer Hotz's police report, she knew "[i]mmediately after pulling up the picture . . . that 'Favian' had provided a falsified name." (*Id.*) Officer Hotz's report differs slightly from her testimony at the November 19 hearing and her

16

body camera footage. She states in the police report that she "ran 'Favian's' identification card," but her body camera footage matches her November 19 testimony that Leiva did not provide Officer Hotz with an Iowa identification card. (Hotz Hr'g Test.; Ex. B at 4:00.) These facts created a reasonable suspicion that Leiva was involved in a crime. Officer Hotz handcuffed Leiva shortly after observing the database picture associated with Favian Estrada did not match Leiva. (Ex. B at 15:39.)

**B.** **Whether Defendants have standing to challenge the search of the SUV and the backpack**

The next issue before the Court is whether either Defendant has standing to challenge the search of the SUV or the backpack. Campbell-Martin argues she had a property interest in the SUV, thus granting her standing to challenge law enforcement's search of the vehicle and its contents, including the backpack. (Doc. 36-1 at 8-11.) She argues she should be considered a bailee under Iowa law, and thus had a property interest in the SUV. (Doc. 53 at 12-13.) She also argues that she had an objectively and subjectively reasonable expectation of privacy in the SUV. (*Id.* at 13-14.) The Government does not appear to dispute Campbell-Martin's standing regarding the SUV, but argues she lacks standing to challenge law enforcement's search of the backpack. (Doc. 42-1 at 15-17.)

Leiva argues he has standing to contest the search of the SUV and the backpack. Leiva argues he had a property interest in the vehicle because he had permission to use it. (Doc. 48 at 4-9; Doc. 34-1 at 7-8.) Regarding the backpack, Leiva argues he has standing to challenge the search because the backpack was in an area under his immediate control within the vehicle, and the backpack contained documents with his identification information. (Doc. 48 at 9-10; Doc. 34-1 at 8.) The Government argues Leiva does not have standing to contest the search of the SUV or the backpack. (Doc. 42-1 at 14-16.) The Government argues Leiva lacks standing to challenge the search of the SUV because

he had no ownership interest in the vehicle and did not provide evidence demonstrating he had permission to drive the vehicle. (*Id.* at 14-15.) The Government argues Leiva lacks standing to challenge the search of the backpack because the exterior of the bag did not indicate Leiva had an ownership interest in the bag, and Leiva claimed after the search that the bag did not belong to him. (*Id.* at 15-16.)

Neither Defendant has demonstrated a reasonable expectation of privacy in the SUV necessary for standing to challenge the search. To challenge a search, a Defendant must demonstrate a reasonable expectation of privacy in the place to be searched. *United States v. Barragan*, 379 F.3d 525, 529 (8th Cir. 2004). Other than claiming they borrowed the car with the owner's permission, neither Defendant presented evidence supportive of the claim that they had a reasonable expectation of privacy in the vehicle.

"An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" *Id.* (quoting *Carter*, 525 U.S. at 88). "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *Id.* The Court determines whether a defendant has proven a sufficiently close connection considering the totality of the circumstances surrounding the search. *Id.* Among the factors the Court may consider are the Defendant's "ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access . . . the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." *Id.* The United States Supreme Court "has explained that '[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts

of real or personal property law or to understandings that are recognized and permitted by society.'" *Byrd v. United States*, 138 S.Ct. 1518, 1527 (2018) (quoting *Rakas v. Illinois*, 439 U.S. 128, 144 n.12 (1978)). To prove a possessory or property interest in a vehicle, the Eighth Circuit has found that "[a] 'defendant must present at least some evidence of consent or permission from the lawful owner/renter [of a vehicle] to give rise to an objectively reasonable expectation of privacy.'" *United States v. Russel*, 847 F.3d 616, 618 (8th Cir. 2017) (quoting *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995)).

> **i.  Defendant Campbell-Martin does not have standing to challenge the search of the SUV or the backpack**

Campbell-Martin's situation is similar to the defendant in *Gomez*. 16 F.3d 254 (8th Cir. 1994). In *Gomez*, an Arkansas State Trooper pulled over the defendant due to a speeding violation. 16 F.3d at 255. The trooper issued the defendant a warning ticket and noticed he "appeared nervous." *Id.* The defendant signed the ticket with a signature different than the driver's license he presented, raising concerns that the driver provided the trooper with false identification information. *Id.* A radio check revealed the defendant's criminal history included two prior drug offenses. *Id.* The trooper then asked the defendant to exit the vehicle before the trooper searched the vehicle and found over thirty-nine pounds of cocaine. *Id.* The Eighth Circuit found the defendant lacked standing to challenge the search:

> [The defendant] failed to show he had a reasonable expectation of privacy in the car. He testified he did not own the car, and the owner did not give him permission to use it. Indeed, he testified he did not even know the owner of the vehicle, and some unidentified third party told him the owner had given permission for its use. [The defendant's] alleged authorization to use the car, combined with his denial of an interest in the cocaine found in the car, do not amount to a reasonable expectation of privacy in the car.

*Id.* at 256.

In the case at bar, Campbell-Martin does not claim to own the car, but argues she was acting as a bailee during the search, thus granting her a property interest in the SUV. (Doc. 53 at 12-13.) However, Campbell-Martin has not offered evidence in support of her argument that she was acting as a bailee. Harris claimed the vehicle owner loaned the vehicle to him and Leiva, after which they picked up Campbell-Martin. (Ex. C at 31:20.) Campbell-Martin has not provided evidence that the vehicle's owner intended for her to drive the vehicle, much less to have a possessory interest in it.

Campbell-Martin also argues that she had "an objectively and subjectively reasonable expectation of privacy in the SUV." (Doc. 53 at 13.) She argues that her discomfort during the interaction with police and her efforts to prevent officers from searching the purse in the back seat suggest a subjective expectation of privacy, while she had an objective expectation of privacy as a person who borrowed another's vehicle. (*Id.* at 13-14.) While showing an interest grounded in property law or an understanding "recognized and permitted by society," supports the argument that a person has a reasonable expectation of privacy in an item, Campbell-Martin has not provided evidence supporting such an interest in the SUV. *Rakas*, 439 U.S. at 144 n.12. As noted above, the interaction between law enforcement and the vehicle's occupants does not suggest that Campbell-Martin had been entrusted with the vehicle. Harris stated the owner allowed him and Leiva to borrow the vehicle. (Ex. C at 33:10.) Harris stated he and Leiva picked up Campbell-Martin after borrowing the vehicle but did not suggest Campbell-Martin had any interest in the vehicle. Campbell-Martin first stated that Harris owned the vehicle, suggesting she did not even know the true owner and thus could not have been the bailee. (Ex. B at 8:25.) Like the defendant in *Gomez*, Campbell-Martin did not own the vehicle and did not appear to have received permission from the owner to use it. As such, Campbell-Martin does not have standing to challenge the search of the SUV.

Campbell-Martin also lacks standing to challenge the search of the backpack, as she offered no evidence to support a reasonable expectation of privacy in the backpack. In fact, Campbell-Martin denied having any knowledge about the backpack. (*Id.* at 46:00.) She stated the bag belonged to Leiva and claimed to have witnessed him pick up the bag in Altoona prior to driving to Marion. (*Id.* at 51:20.) As such, Campbell-Martin has no expectation of privacy in the backpack and thus lacks standing to challenge law enforcement's search of the backpack.

### ii. *Defendant Leiva does not have standing to challenge the search of the SUV*

Leiva also lacks standing to challenge the search of the SUV because he has not demonstrated an expectation of privacy in it. As noted above, "[a] 'Defendant must present at least some evidence of consent or permission from the lawful owner/renter [of a vehicle] to give rise to an objectively reasonable expectation of privacy.'" *Russel*, 847 F.3d at 619 (quoting *Muhammad*, 58 F.3d at 355). As a passenger, Leiva must demonstrate a property or possessory interest in the vehicle to have standing to challenge a search. *Id.* at 618. To demonstrate such an interest in the vehicle, Leiva must present "direct evidence" supporting a claim that he had permission to use the vehicle. *Muhammad*, 58 F.3d at 355.

Leiva has provided only an assertion, without evidence, that he had permission to use the SUV. Leiva's argument overstates the proof adduced regarding that permission. He argues, "Specifically, the video from a body cam clearly shows that the third person in the car, Justin Harris, told an officer that the owner of the vehicle had, earlier that day, given him and Leiva permission to use the vehicle." (Doc. 48 at 5 citing Exhibit C at 31:20.) In fact, the exchange with Harris says very little about who may have received permission to use the vehicle:

> Sgt. Holland: Who had the car originally? You or her? Wherever you came from … who started?
> Harris: I did.
> Holland: Okay.
> Harris: Along with Adam. We both picked it up together.

(Ex. C at 31:20.)

At best this statement shows Harris and Leiva both picked up the SUV earlier in the day. This reed is too slender to support Leiva's claim of permission to use the vehicle. The record is otherwise devoid of evidence of Leiva's permission. The registered owner of the vehicle was Kristin Jefferson. Harris had previously told Sergeant Holland the owner was April Johnson and then that she was merely the "co-signer." Neither Johnson nor Jefferson testified. No evidence established the relationship of Johnson or Jefferson to any occupant of the vehicle. No evidence established any historical use of the vehicle by any of the occupants. No evidence established the terms of any "bailment." People can be casual about lending their vehicles. Vehicles are certainly loaned among family and friends without any sort of written agreement. "Dad always lets me drive his Buick to school" or "You can take the car tonight, but return it full of gas" are plausible examples of casual bailments that might occur. Here, Defendants offer no such explanation to support the alleged permission to use the SUV.

While law enforcement was able to confirm the vehicle was not stolen, this is not sufficient evidence to demonstrate Leiva had permission to use or operate the vehicle. *Muhammad*, 58 F.3d at 355. As such, Leiva has not provided direct evidence that he had permission to use the SUV and thus lacks standing to challenge the search of the vehicle.

### iii.     Defendant Leiva has standing to challenge the search of the backpack

Although Leiva has not demonstrated a reasonable expectation of privacy in the automobile, he would still have standing to challenge the search of the backpack if he

22

demonstrated an interest in it. *Rakas*, 439 U.S. at 148. Leiva has demonstrated his interest in the backpack that created a reasonable expectation of privacy in it. Sergeant Holland found the backpack on the floor of the front passenger-side of the vehicle, where Leiva was sitting, suggesting Leiva had some relationship to it. As discussed above, an individual has standing to challenge a search of property if he "prove[s] a sufficiently close connection to the relevant places or objects searched." *Gomez*, 16 F.3d at 256; *see also Carter*, 525 U.S. at 88 ("[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."). A court conducts a totality of the circumstances analysis to determine if the defendant has proven such a connection.

In the case at bar, the inventory of the backpack was conducted after Leiva was seized and while he was in a police vehicle. In the backpack, Sergeant Holland discovered the drugs as well as papers in both Defendants' names. The officers had seen the backpack in the area where Leiva had been sitting, but it does not appear that they made any inquiry about his connection to the backpack until after they searched it. Once the drugs were discovered, Leiva was removed from the police vehicle, Mirandized, and questioned about it. When Sergeant Holland asked Leiva about the backpack, he stated it was already in the vehicle before he became a passenger. (*Id.* at 28:10.) Leiva also denied knowledge of the backpack's contents. (*Id.*) He was (or at least acted) surprised that drugs were in the bag. His statements tended more toward dissembling than to outright denials of ownership.

Where a passenger in a vehicle has a legitimate expectation of privacy in an object within the vehicle, they may challenge the search of that object, even if they lacked standing to challenge the search of the vehicle itself. *United States v. Trejo*, 135 F.Supp.3d 1023, 1031 (D. S.D. 2015) (citations omitted). To determine if a defendant has a legitimate expectation of privacy in an object, a court should look at factors such

as, ". . . ownership, possession or control, historical use of the object, whether the object contained the defendant's personal belongings, the ability to regulate access to the object, and all of the circumstances surrounding the search." *Id.*

The case at bar is similar in some respects to *United States v. Garmon*, No. 0:17-CR-11-SRN-KMM, 2018 WL 3104249 (D. Minn. Apr. 9, 2018), *report and recommendation adopted,* No. 17-CR-11 (SRN/KMM), 2018 WL 2383160 (D. Minn. May 25, 2018). In *Garmon* the police stopped a vehicle with four occupants. After determining the defendant had an outstanding warrant, he was removed from the vehicle, handcuffed, and placed in the police car. The arresting officer had seen a black backpack at defendant's feet on the front passenger seat floorboard, but the defendant denied it belonged to him. The officer believed the defendant was lying because the backpack was in the area of his immediate control prior to his arrest. The officer then retrieved the backpack and searched it.

*Garmon* held,

> "The Fourth Amendment is not implicated by a search of property that has been abandoned because a defendant who has abandoned his property has relinquished his reasonable expectation of privacy." *United States v. Nowak*, 825 F.3d 946, 948 (8th Cir. 2016) (quotations and alterations omitted). The decision of whether property has been abandoned must be made in light of "the objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *Id.* (quoting *United States v. James*, 534 F.3d 868, 873 (8th Cir. 2008) ). Abandonment may be shown where the defendant either physically relinquishes property or denies that he owns it. *Id.* (citing *United States v. Simpson*, 439 F.3d 490, 494 (8th Cir. 2006) ). This issue is determined by the totality of the circumstances. *Id.*
>
> Here, no violation of Mr. Garmon's Fourth Amendment rights occurred because he denied that he owned the backpack prior to the search. The uncontroverted evidence that Mr. Garmon told Officer Matsen that the backpack was not his is sufficient to demonstrate that he abandoned the backpack. *United States v. Sanders*, 196 F.3d 910, 914 (8th Cir. 1999)

24

(concluding that the defendant's statements to the officers that he did not own a maroon bag were sufficient to constitute abandonment); *United States v. Sanders*, 130 F.3d 1316, 1317 (8th Cir. 1997) (same). This is true even if Mr. Garmon later intended to reclaim the backpack. *Nowak*, 825 F.3d at 948 (citing *United States v. Basinski*, 226 F.3d 829, 836–37 (7th Cir. 2000) ("[I]t does not matter whether the defendant harbors a desire to later reclaim an item.") ). Nor does it change the Court's conclusion that Officer Matsen believed Mr. Garmon was being untruthful when he denied ownership. *Sanders*, 196 F.3d at 914 ("Even if the Agents knew that Sanders was lying when he claimed not to know anything about the ball of tape and the maroon bag, this Court still must conclude that the property was abandoned.") (citing *Sanders*, 130 F.3d at 1318 (rejecting the defendant's argument that a finding of abandonment was clear error "because officers knew he was lying when he claimed not to own the brown bag") ).

In essence, because Mr. Garmon "forfeited his Fourth Amendment guarantee of privacy" when he denied that the bag belonged to him, *Sanders*, 130 F.3d at 1318, his rights were not violated by Officer Matsen's search. His motion to suppress evidence obtained from inside the bag should be denied.

*Garmon*, No. 0:17-CR-11-SRN-KMM, 2018 WL 3104249, at \*6.  The instant case is distinguishable because Leiva did not deny his connection to the bag prior to the search. He dissembled about his relation to the bag after the methamphetamine was discovered. He did so in the context of Officer Hotz and Sergeant Holland telling him that he had possession of the backpack because of its location and that he was going to be responsible for what they found in it. *See* Body Camera citations in Doc. 48 at 10-11.  I find that Leiva had not abandoned whatever interest he may have had in the backpack prior to its search.

The factors in *Trejo* tend to support Leiva's standing to object prior to the search. There is almost no evidence regarding ownership of the backpack.  However, it was located on the passenger side of the vehicle and thus within Leiva's possession or control. It contained documents with information about both Leiva and Campbell-Martin which

seems to at least hint at his historical use of it. If Leiva had been asked for permission to search the backpack, he might have denied ownership and thereby abandoned his interest in it. However, based on these factors, he could have legitimately denied permission for the search. Therefore, I conclude that Leiva has demonstrated a sufficiently close relationship to the backpack that gives him standing to challenge law enforcement's search.

## C.    *The Government's inevitable discovery doctrine argument is inapplicable.*

The Government argues that even if officers knew or believed the bag belonged to Leiva or Campbell-Martin (and, presumably that they had standing to object to its search), the evidence would have been inevitably discovered during the inventory search. (Doc. 42-1 at 16.) The inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without an unconstitutional violation. *Utah v. Strief,* 136 S. Ct. 2056, 2061 (2016) (citing *Nix v. Williams,* 467 U.S. 431, 443-44 (1984)); *Hogan v. Kelley,* 826 F.3d 1025, 1028 (8th Cir. 2016), *cert. denied,* 138 S. Ct. 635 (2018). "The inevitable discovery exception to the exclusionary rule . . . allows the government to show by a preponderance of the evidence that the evidence seized would have been discovered in any event by lawful means." *United States v. Halls*, 40 F.3d 275, 276 (8th Cir. 1994) (citations omitted).

For the inevitable discovery doctrine to apply, the Government must prove not only that the evidence would have been discovered by lawful means, but also that the officers were "actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *Id.* (citing *United States v. McManaman,* 673 F.3d 841, 846 (8th Cir. 2012)). In *McManaman,* the Eighth Circuit held that child pornography seized in a search of defendant's home need not be suppressed because drug paraphernalia found on the defendant's person when he was arrested would have given officers enough

probable cause to get a search warrant that would have ultimately led to the discovery of the pornography. 673 F.3d at 847-48.

In *Halls*, a Missouri trooper stopped the Defendant without reasonable suspicion justifying the investigative stop. *Id.* Missouri officers obtained a search warrant based on the initial stop and the existence of an outstanding Iowa warrant. *Id.* The subsequent search that yielded drug paraphernalia and a firearm violated the Defendant's Fourth Amendment rights because the search warrant was based in part on the stop that lacked reasonable suspicion. *Id.* However, the Eighth Circuit found the inevitable discovery doctrine made the evidence admissible. *Id.* at 276-77. The Court found that had the Missouri trooper not unlawfully stopped the Defendant, other law enforcement officers with a valid Iowa warrant waiting for the Defendant to cross the border into Iowa would have lawfully stopped the Defendant. *Id.* In such a case, law enforcement would have inevitably discovered the unlawfully obtained evidence through alternative lawful means.

I find that if the search of the bag – or the vehicle – was unconstitutional, discovery of the evidence in the vehicle was not inevitable during an inventory search of an impounded vehicle. The search of the vehicle or the bag would be unconstitutional if Officer Hotz did not have reasonable suspicion to conduct an investigative stop of Defendants. There was no evidence of an alternative line of investigation that would have led to a constitutional search of the vehicle. Under the facts of this case, any search of the SUV would have been tied to the initial stop of Defendants. Accordingly, I find that if the Defendants were unlawfully detained without reasonable suspicion or if officers unlawfully conducted a search in violation of either Defendant's reasonable expectation of privacy, the evidence in the vehicle would not have been found through inevitable discovery. The Government does not offer an independent, lawful means through which law enforcement would have discovered the suspected methamphetamine outside of an inventory search. Therefore, the inevitable discovery doctrine is

inapplicable, and the relevant question is whether law enforcement conducted a proper inventory search. As discussed below, the police conducted a proper inventory search up to the point of finding the bag of suspected methamphetamine in the backpack.

### D. Whether the warrantless search of the SUV and its contents was unconstitutional.

The next issue before the Court is whether an exception to the Fourth Amendment's warrant requirement allowed law enforcement's warrantless search of the SUV and the backpack. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. U.S.*, 389 U.S. 347, 357 (1967). As such, the Court must find whether any exception was applicable to law enforcement's search of the SUV.

Defendants argue the search incident to arrest exception (Doc. 34-1 at 9-10; Doc. 36-1 at 12-13; Doc. 48 at 16-19; Doc. 53 at 15-16), automobile exception (Doc. 34-1 at 10-11; Doc. 36-1 at 12-13; Doc. 53 at 12-13), and inventory exception (Doc. 34-1 at 12-15; Doc. 36-1 at 13-18; Doc. 48 at 19-22; Doc. 53 at 16-22) are all inapplicable. The Government responds that both the inventory and search incident to arrest exceptions are applicable. (Doc. 42-1 at 17-20.) The Government argues law enforcement's search of the SUV and the backpack was an inventory search conducted pursuant to the Marion Police Department's inventory and impound policies. (*Id.* at 18-20.) The Government also argues the search incident to arrest exception justifies law enforcement's search of the SUV and backpack. (*Id.* at 17.) As the Government does not argue that the automobile exception applies to this case, my analysis addresses only the search incident to arrest and inventory exceptions.

If the Court finds that neither Defendant has standing to challenge the search of the SUV and backpack, then whether an exception to the warrant requirement was

28

applicable is immaterial. However, if the Court finds that one or both Defendants have standing to challenge the search, I recommend the Court find the inventory search exception is applicable. I recommend the Court not suppress evidence found during the inventory even if Sergeant Holland violated the Marion Police Department's inventory policies when he failed to seek a search warrant. Lastly, I recommend the Court find the search incident to arrest exception is inapplicable because the search was not necessary to protect officer safety or to preserve evidence from destruction. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009).

### i.      *Inventory exception*

The inventory search exception is applicable to law enforcement's search of the SUV and backpack at least to the point that Sergeant Holland discovered the suspected methamphetamine. Sergeant Holland testified that, pursuant to the policy, he should have stopped and obtained a search warrant once he found the methamphetamine. (Holland Test. at 114.) The inventory exception to the warrant requirement applies when law enforcement impounds vehicles and was developed "in response to three distinct needs: the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (internal citations omitted). When police conduct a proper inventory search, they are performing their community caretaking function, not their criminal investigatory function, and thus do not need a warrant or probable cause. *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011). An inventory search "must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). The Eighth Circuit has said,

> The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally

"remove the inference that the police have used inventory searches as 'a purposeful and general means of discovering evidence of a crime.'"

*Taylor*, 636 F.3d at 464 (quoting *United States v. Marshall*, 986 F.2d 1171, 1174 (8th Cir. 1993)). Conducting an inventory search according to standardized police procedures "vitiate[s] concerns of an investigatory motive or excessive discretion." *Marshall*, 989 F.2d at 1174. However, perfect adherence to a police department's procedures is not required for a court to find an inventory search is reasonable. *Taylor,* 636 F.3d at 465. An inventory search is reasonable "[e]ven if police fail to adhere to standardized procedures . . . provided it is not a pretext for an investigatory search." *Id.* Lastly, officers do not have to approach an inventory search without expectations that they may find evidence of criminal activity. *United States v. Porter*, 859 F.2d 83, 85 (8th Cir. 1988) (per curiam) (noting "an officer's suspicion that evidence may be present does not invalidate an otherwise lawful search").

Determining whether the police conducted a valid inventory search requires answering three questions: (1) Did law enforcement properly impound the vehicle? (2) Was the inventory search conducted pursuant to standardized procedures? and (3) Did the police act in bad faith or for the sole purpose of investigation? *Colorado v. Bertine*, 479 U.S. 367, 37 (1987). As discussed below, law enforcement properly impounded the vehicle and conducted the inventory search pursuant to standardized polices up to the point when Sergeant Holland discovered the bag containing suspected methamphetamine. Law enforcement's search after discovering the suspected methamphetamine was in violation of Guideline C of the Marion Police Department's inventory policy. (Gov. Ex. 1 at 1.)

The Court must address whether this violation creates an inference that the search was investigatory in nature and was not an inventory search. *Taylor*, 636 F.3d 461. In *Taylor* the officer violated the specificity requirement of his department's policy and

merely wrote "misc. tools" on the inventory form to denote hundreds of valuable tools in the defendant's vehicle. This failure to specify the items in the vehicle or otherwise attempt to account for them using photographs was "insufficient to remove the inference that the search was investigatory." *Taylor* continued:

> Even if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search. "[S]omething else" must be present to suggest that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the defendant's vehicle. Here, the "something else" is found in the officer's testimony at the suppression hearing. Officer Gillespie testified that the basis for the traffic stop, the arrest, the towing of the vehicle, and the inventory search was the officer's belief that Taylor had narcotics in his vehicle. She also testified that she would not have arrested Taylor, impounded his vehicle, or inventoried the contents of the truck if not for her belief that the vehicle contained evidence of a narcotics crime. This testimony leads us to conclude that the search was conducted because police believed they would find evidence of narcotics in Taylor's truck, and thus the inventory was merely a pretext for an investigatory search.

*Id.* at 465.

In the instant case, there does not appear to be "something else" present to suggest that the police were engaging in their criminal investigative function as in *Taylor*. Both Officer Hotz and Sergeant Holland testified to their belief that Campbell-Martin was under the influence of narcotics. Sergeant Holland also stated while looking through items in the car that "[t]hese people are up to no freaking good." (Holland Test. at 114.) Their desire to examine the contents of the car is evident. However, even if they were motivated in part by investigatory desire, the decision to impound the vehicle was in accord with department policy because "the owner or other person in possession of the vehicle [was arrested.]" (Gov. Ex. 1.) Even in Harris were deemed "in possession" (which was far from clear), he did not appear to have a valid driver's license. Unlike

*Taylor,* Defendants were arrested, and the vehicle was impounded and subject to inventory regardless of the officers' belief the vehicle would contain evidence of a crime. Thus, the decision to commence the inventory was not merely a pretext and the subsequent discovery of methamphetamine in the backpack need not be suppressed.

As stated above, Sergeant Holland admitted he should have ceased the search and sought a warrant after discovering the methamphetamine. The policy provides,

> Vehicle inventories are not to be conducted as a subterfuge to obtain evidence of a crime. If property being inventoried is determined to be related to a suspected crime, officers are to stop the inventory and begin the process of collecting evidence through consent or a search warrant being filed.

(Gov. Ex. 1) The policy appears to be drafted to permit Marion Police to conduct constitutionally permissible vehicle inventories. Leiva argues,

> Indeed, it is difficult to imagine a greater deviation from policy than conducting a full search of the vehicle and all its contents when the policy calls for the search to stop. Moreover, non-compliance with applicable policy or procedure creates an inference of pretext.

(Doc. 48 at 20.) I respectfully disagree. A much greater deviation occurs, as it did in *Taylor,* when the search is *initiated* under pretext rather than when it is continued after evidence is discovered. Here, I have found the inventory was not initiated from mere pretext but in accord with police department policy. No party has cited constitutional authority (as opposed to the department's policy) that requires an inventory to cease when "property being inventoried is determined to be related to a suspected crime." On the contrary, the fact that a police officer suspects evidence of a crime is present does not invalidate an otherwise lawful search. *Porter*, 859 F.2d at 85. Noncompliance with the policy is concerning when it creates the inference of pretext. "Even if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search." *Taylor*, 636 F. 3d at 465. The Fourth

Amendment concern is not that the Marion Police Department policy is followed to the letter, but that the inventory is not a pretext to investigate. Here, the fact that Sergeant Holland *continued* to search after finding suspected methamphetamine may have violated departmental policy in favor of obtaining a search warrant or consent. However, the continued inventory does not raise a concern that it was *initiated* under pretext. Unlike *Taylor* where multiple factors supported the conclusion the inventory was pretextual, I conclude the instant case is distinguishable and the evidence need not be excluded despite the fact the policy was not strictly adhered to. The methamphetamine recovered was found with no violation of the policy. The evidence subsequently discovered need not be suppressed because of the failure to adhere strictly to the policy.

> ### a. *The police properly impounded the vehicle in accordance with the Marion Police Department's vehicle impound and inventory policies.*

The Government's Exhibit 1 is the Marion Police Department's Operational Policy for vehicle impound inventory in effect in May 2018. Guideline A.6 states that officers have authority to remove and/or impound a vehicle "[w]hen the owner or other person in possession of a vehicle is arrested *and the arrested person is unwilling or unable to have the vehicle moved*." (Gov. Ex. 1 at 1.) However, the italicized language was added after the Iowa Supreme Court's June 29, 2018 decision in *State v. Ingram*, and thus was not part of the department's policy in May 2018. 914 N.W.2d 794 (Iowa 2018.) *Ingram* "stake[d] out higher constitutional ground" holding that a warrantless inventory search violated article I, section 8 of the Iowa Constitution even if it was permissible under United States Constitution. *Id.* at 797-98. The court held:

> We note that our holding in this case does not mean that a warrantless impoundment of a vehicle is never appropriate. The state may develop a policy on impoundment and inventory searches consistent with the constitutional requirements embraced in this opinion. For example, a policy might provide that the police may impound a vehicle when the motorist

agrees to such impoundment and has had an opportunity to retrieve his or her belongings. And a policy might provide for impoundment of vehicles when the motorist is not present to give consent. Under these circumstances, law enforcement may implement a policy that allows officers to properly secure closed containers found in plain view at the police station. The impoundment and search in this case, however, was outside the bounds of any constitutionally permissible local impoundment and inventory policy.

*Id.* at 821. Thus, the Marion Police Department policy appears to have been an effort to comply with *Ingram*. No party has suggested that this Court is bound by *Ingram* in this case.

Defendants argue the police did not need to impound and conduct an inventory search on the SUV because Harris was a valid driver and could have driven the car away while police took the Defendants into custody. (Doc. 34-1 at 12; Doc. 53 at 17.) Campbell-Martin argues that Guideline A.6 is only constitutional if "read to apply only when no other owner or people in possession who are valid drivers are present," but does not cite authority supporting this position. (Doc. 53 at 19.)

The record is somewhat confused regarding Harris's driver's license status and what law enforcement knew about it. Officer Hotz testified Harris presented her with an Iowa identification card, not a driver's license. (Hotz Test. at 14.) Officer Hotz thought he was not a valid driver. (*Id.* at 61.) She testified that most people are required to turn in an identification card if they have an Iowa driver's license. (*Id.* at 62.) She assumed from the presentation of the identification card that he had no valid driver's license. (*Id.*)

However, Sergeant Holland seemed to be principally in charge of disposition of the vehicle. He would not allow Harris to drive it. (Holland Test. at 90.) Sergeant Holland testified that Harris told him he was a valid driver and Sergeant Holland believed him. (*Id.* at 97.) There is a discussion at 19:48 of Exhibit C (Holland's video) where Sergeant Holland, Officer Hotz, and another officer appear to be discussing whether

34

Harris "is valid." This portion of the video was played for Officer Hotz at the hearing. (Hotz. Test. at 73-74.) At this point, Sergeant Holland seems to assume that Officer Hotz had already determined that Harris is valid. Officer Hotz's response is not directly responsive on the issue of whether Harris has a valid license. She instead seems to discuss whether Harris needs to be held on any charge. This discussion does not amount to evidence that the officers had actually determined Harris had a valid license. It does not appear from this that the officers checked Harris's license status at the time of their interaction.

The night before the hearing Officer Hotz determined Harris did not have a valid driver's license on the night of the incident. (Hotz Test. at 61.) It seems to follow, that if the officers checked they would have learned he did not have a valid license at the time of the incident. Defendants have not offered evidence that Harris was, in fact, a valid driver at the time of his encounter with Marion Police.

Ultimately, their rationale for denying Harris permission to drive the SUV is founded on his inability to establish a legitimate connection to the car's owner, Kristin Jefferson. In fact, Harris, according to Sergeant Holland, did not know the owner's name and had received the car from a "friend of a friend." (Holland Test. at 126.) Regardless of Harris's driver's license status, the plain language of the Marion Police Department's Operational Policy as of May 2018 did not require officers to allow Harris to drive the vehicle. As stated above, the policy as of May 2018 provided officers authority to impound and inventory vehicles "[w]hen the owner or other person in possession of a vehicle is arrested." (Gov. Ex. 1 at 1.) In the case at bar, Campbell-Martin was a person in possession of the SUV when she was arrested. (Ex. C at 33:00.) As such, the police officers properly impounded the SUV in accordance with the Operational Policy in effect at the time of the officers' encounter with the Defendants. The prospect of Harris driving

off with the SUV as an alternative to impounding it under these circumstances is speculation and is not a basis to invalidate the inventory.

>    ***b.***   ***The police followed standardized procedures in impounding and conducting an inventory search of the SUV until Sergeant Holland found the bag of suspected methamphetamine.***

Police officers followed the Marion Police Department's inventory procedures until Sergeant Holland continued the search after finding the suspected bag of methamphetamine. The Operational Policy Guideline C states that "officers are to stop the inventory and begin the process of collecting the evidence through consent or a search warrant" when "property being inventoried is determined to be related to a suspected crime." (Gov. Ex. 1 at 1.) Leiva argues police violated this guideline when Officer Hotz discovered a spray can in the backseat of the SUV, slightly before Sergeant Holland discovered the suspected methamphetamine. (Doc. 48 at 19.) However, Officer Hotz's body camera footage does not suggest she thought the spray can was "related to a suspected crime." (Gov. Ex. 1 at 1; Ex. B at 35:00.) Officer Hotz's body camera footage shows that when she discovered the spray can, she did not know what it contained or its possible uses, asking Sergeant Holland "what do you use this for?" (Ex. B at 36:10.) Officer Hotz then asks Sergeant Holland "would [the spray can] be for the AC, you think?" Sergeant Holland responds "yeah, it could be." (Ex. C at 20:55.) This exchange does not suggest either officer believed the spray can was evidence of a suspected crime.

Officer Hotz and Sergeant Holland also opened containers during the inventory search, which Leiva argues was unauthorized and contrary to the Operational Policy. However, Procedure C of the Operational Policy in effect in May 2018 states that "[c]losed containers which are likely repositories of valuables or important items should be opened as part of a routine inventory providing this can be conducted without

36

damaging the container." (Gov. Ex. 1 at 2.) As such, Officer Hotz and Sergeant Holland followed the written procedure for impounding and conducting an inventory search of the SUV up until Sergeant Holland discovered the suspected methamphetamine.

### c.     The police did not act in bad faith or for the sole purpose of investigation in conducting the inventory search.

Although the police were likely suspicious Defendants were involved in criminal activity when they started the inventory search, this alone does not invalidate the inventory search. As discussed above, "an officer's suspicion that evidence may be present does not invalidate an otherwise lawful search." *Porter*, 859 F.2d at 85. Furthermore, conducting the inventory pursuant to standardized procedures, "vitiate[s] concerns of an investigatory motive or excessive discretion." *Marshall*, 989 F.2d at 1174. Eighth Circuit precedent suggests officers must have both violated a procedure and conducted the inventory search in their criminal investigatory function for the court to invalidate an inventory search:

> Even if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search. 'Something else' must be present to suggest that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the Defendant's vehicle.

*Taylor*, 636 F.3d at 465 (internal citations omitted) (quoting *United States v. Rowland*, 341 F.3d 774, 780-81 (8th Cir. 2003).

The record shows officers suspected wrongdoing when they began the inventory search. The most obvious indication of this was Sergeant Holland's statement that the vehicle occupants were "up to no . . . good" as he conducted the inventory search. (Ex. C at 20:53.) However, the Defendants are unable to show that officers conducted the inventory search while engaged in their criminal investigatory function rather than their

37

caretaking function. As such, Officer Hotz and Sergeant Holland did not engage in the inventory search as a pretext for an investigatory search.

### ii. *Search incident to arrest exception*

The search incident to arrest exception is inapplicable to law enforcement's search of the SUV and backpack because the search was not necessary either to protect officer safety or to preserve evidence from destruction. *See Gant*, 556 U.S. at 338. One of two conditions must be satisfied for the search incident to arrest exception to be applicable: (1) the Defendant(s) must be able to reach the vehicle at the time of the search; or (2) law enforcement has a reasonable belief that evidence of the offense of arrest may be found in the vehicle. *Id.* at 335.

The Defendant in *Gant* was arrested for driving with a suspended license. *Id.* at 336. Law enforcement handcuffed Gant and placed him in the back of their patrol car prior to searching his vehicle. *Id.* The officer's search yielded a bag of cocaine. *Id.* The Court affirmed the Arizona Supreme Court's decision that the search incident to arrest exception was not applicable because the *Gant* defendant "could not have accessed his car to retrieve weapons or evidence at the time of the search;" he was handcuffed in the back of a patrol car. *Id.* at 335. The Court noted that while "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle,'" no such circumstances justified law enforcement's search of Gant's vehicle. *Id.* at 343 (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring)).

Like the defendant in *Gant*, Campbell-Martin and Leiva were handcuffed in the back of patrol cars when law enforcement searched the SUV. (Ex. B at 15:39; 33:17.) They were thus unable to reach the SUV while officers were conducting their search.

The Government is also unable to show officers had a reasonable belief that evidence of the offense of arrest may have been in the SUV. In *Gant*, the Supreme Court

38

noted that in many cases law enforcement will not have a reasonable belief that evidence of the offense of arrest may be found in a vehicle. *Gant*, 556 U.S. at 344. The Court singled out two cases, *New York v. Belton* and *Thornton v. United States*, in which the offense of arrest would supply a basis for searching the arrestee's vehicle. *Id.* Both *Belton* and *Thornton* involved arrests based on possession of illegal substances that occurred when the arrestees were in their vehicles. *Thornton*, 541 U.S. at 618; *New York v. Belton*, 453 U.S. 454, 456 (1981). A charge of illegal possession of drugs creates a reasonable belief that more drugs may be present in the vehicle. Although law enforcement eventually discovered illegal drugs in the SUV, Defendants Campbell-Martin and Leiva were arrested for providing false information. (Ex. B at 15:39; 33:17.) The offense of providing false information differs significantly from the illegal possession cases the Supreme Court cited in *Gant*, and it does not provide a basis for a reasonable belief that the vehicle may contain further evidence of the offense. As such, the search incident to arrest exception is inapplicable to law enforcement's discovery of the suspected methamphetamine through an inventory search.

## V. CONCLUSION

For the reasons set forth above, I respectfully recommend Defendants' Motions to Suppress (**Docs. 34 and Doc. 36**) be **denied.**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the

district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 9th day of January, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa